UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:

SANDRA HORTON,                        :        15 Civ. 6937 (JCF)

          Plaintiff,           :        MEMORANDUM
                                      :        AND  ORDER
- against -                           :

CAROLYN W. COLVIN, Acting             :
Commissioner of Social Security,      :

          Defendant.           :

- - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 8/17/16

    The plaintiff, Sandra Horton, brings this action pursuant
to section 205(g) of the Social Security Act (the "Act"), 42
U.S.C. § 405(g), seeking review of a determination by the
Commissioner of Social Security (the "Commissioner") denying her
application for Disability Insurance Benefits.  The plaintiff
alleges that she is disabled due to carpal tunnel syndrome, left
elbow epicondylitis, degenerative joint disease, degenerative
disc disease of the cervical spine, hypertension, high blood
pressure, depression, and seizure disorder.

    The parties have submitted cross-motions for judgment on
the pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure.  For the reasons set forth below, the
Commissioner's motion is granted and Ms. Horton's motion is
denied.

Background

A.  Personal History

Ms. Horton was born in 1963. (R. at 178). She graduated from high school and completed one year of college. (R. at 43, 193). The plaintiff currently lives with her boyfriend and adult son. (R. at 40-41). Her work history includes twenty-five years as a corrections officer. (R. at 193). This job required her to regularly lift fifty pounds or more and stand and walk for at least eight hours per day. (R. at 194). Ms. Horton stopped working in January 2012 due to alleged neck pain and pain and numbness in her hands. (R. at 43-46).

B.  Medical History

    1.  Physical Evaluations

        a.  Dr. Richard Memoli

From October 2010 through May 2012, Ms. Horton was treated by Dr. Richard Memoli for tenderness in both wrists and carpal tunnel syndrome. (R. at 249-333). In December 2010, she underwent a nerve conduction study, and the impressions showed "denervation" consistent with "C5-C6-C7 Root Entrapment."[1] (R. at

---

[1] Nerve root entrapment pain stems from vertebral instability and is characterized by brief waves of stabbing or sharp pain or a band of burning pain just below the level of injury. Pain Management Following Spinal Cord Injury, University of Alabama at Birmingham Department of Physical Medicine & Rehabilitation 2-3 (May 2001), http://images.main.uab.

296-98). In October and December 2011, Dr. Memoli reported that
Ms. Horton had cervical radiculopathy,[2] bilateral carpal tunnel
syndrome, and left tennis elbow. (R. at 259, 262). He diagnosed
a mild to moderate partial disability. (R. at 259, 262). At both
visits, the plaintiff reported improvement. (R. at 259, 262).

Between March and May 2012, Ms. Horton's symptoms improved
slightly with therapy twice weekly, but she continued to
complain of numbness, tenderness, and decreased sensation. (R.
at 253-56). Dr. Memoli reported that Ms. Horton had cervical
radiculopathy, a herniated disk at C5-6 on the right, bilateral
carpal tunnel syndrome, and left tennis elbow. (R. at 253). Dr.
Memoli again assessed a mild to moderate partial disability, and
stated in March 2012 that Ms. Horton could continue doing "light
duty" work. (R. at 256).

b.  Dr. Eial Faierman

Dr. Eial Faierman treated Ms. Horton from May 2011 to
September 2013 for orthopedic issues. (R. at 378-82, 403-25,

---

edu/spinalcord/SCI%20Infosheets%20in%20PDF/Pain%20Management%20f
ollowing%20SCI.pdf (last updated May 2001).

[2] Cervical radiculopathy, commonly called a "pinched
nerve," causes pain that radiates into the shoulder, as well as
muscle weakness and numbness that travels down the arm and into
the hand. Cervical Radiculopathy (Pinched Nerve), OrthoInfo –
American Academy of Orthopedic Surgeons,
http://orthoinfo.aaos.org/topic.cfm?topic=a00332 (last updated
June 2015).

449-79). In May 2011, he diagnosed double crush syndrome[3] with bilateral carpel tunnel syndrome, for which he recommended bilateral carpel tunnel release surgery. (R. at 407-08).

In February 2012, Dr. Faierman observed some paralumbar tenderness, but no veterbral tenderness and normal deep tendon reflexes. (R. at 414). In May 2012, an MRI scan revealed left tennis elbow. (R. at 417). Ms. Horton alleged neck pain with bilateral upper extremity radiculopathies and stated she was not working. (R. at 417). Physical examination revealed that she had a full range of motion of all the wrist and hand joints. (R. at 417).

In July 2012, Ms. Horton underwent right carpal tunnel release and flexor tenosynovectomy surgery.[4] (R. at 380-81). In September 2012 she had a follow-up appointment, at which she reported some pain over a scar on her right palm as well as some improvement in her right hand numbness. (R. at 425). All of her wrist and hand joints had a full range of motion, both of her

---

[3] Double crush syndrome occurs when a nerve is compressed in two places, resulting in numbness. Numb Hands, American Society for Surgery of the Hand, http://www.assh.org/handcare/Hand-Anatomy/Details-Page/articleId/39416 (last updated 2007).

[4] Tenosynovectomy refers to the surgical excision of a tendon sheath. Tenosynovectomy, Merriam-Webster Medical Dictionary Online, http://www.merriam-webster.com/medical/tenosynovectomy (last visited Aug. 16, 2016).

upper extremities were neurovascularly intact, and there was no warmth or redness of the skin. (R. at 425).

In November 2012, Ms. Horton reported continued intermittent right hand pain with less numbness, as well as numbness in the left hand. (R. at 454). In December 2012, the pain had not resolved and Ms. Horton requested a left carpal tunnel release. (R. at 457). On January 9, 2013, Dr. Faierman performed left carpal tunnel release surgery. (R. at 463-64). At a follow-up appointment in March 2013, the plaintiff retained full range of motion in the wrist and hand joints but alleged continued sensitivity in her left hand. (R. at 467). She was involved in occupational therapy at the time of this visit. (R. at 467).

In April 2013, Ms. Horton reported continued left elbow pain, intermittent bilateral hand pain, and pain over her palm scar, although she retained full range of motion of all wrist and hand joints. (R. at 470). At this examination and again in June 2013, Ms. Horton had a limited active range of motion due to pain in all cervical spine planes, normal deep tendon reflexes, normal sensation to light touch, and normal motor strength in all upper extremities. (R. at 473). Examinations in July 2013 and September 2013 resulted in similar findings. (R. at 476, 479).

In December 2013, Dr. Faierman found a limited active range of motion in the cervical planes and continued bilateral upper extremity radiculopathy and weakness. (R. at 510). He found sensitivity over Ms. Horton's left palm scar, a full range of motion of all wrist and hand joints, and full motor strength, normal sensation to light touch, and normal deep tendon reflexes in the upper extremities. (R. at 510). He diagnosed double crush syndrome with bilateral carpal tunnel syndrome. (R. at 510).

At that time, Dr. Faierman completed a workers' compensation form in which he reported that Ms. Horton suffered from a neck sprain and carpal tunnel syndrome. (R. at 511). He assessed the plaintiff's functional capabilities and exertional abilities, noting that she could occasionally lift, carry, push, and pull ten pounds; frequently sit, stand, walk, climb, kneel, bend, stoop, and squat; frequently perform fine manipulation; occasionally perform simple grasping; frequently reach overhead at and below shoulder level; and frequently drive. (R. at 513). He assessed that she was able to perform sedentary work. (R. at 513).

In January 2014, Dr. Faierman noted a full range of motion in all of Ms. Horton's wrist and hand joints, normal tendon reflexes and sensation to light touch in all upper extremities, and limited active range of motion in spine planes due to pain. (R. at 518). On February 12, 2014, Dr. Faierman performed

6

bilateral trigger point injections to Ms. Horton's trapezius (R. at 521), and on February 26, 2014, he performed bilateral trigger point injections to Ms. Horton's posterior cervical spine (R. at 527). On March 3, 2014, Dr. Faierman again performed bilateral trigger point injections to Ms. Horton's trapezius. (R. at 533).

      c. <u>Dr. Brian Haftel</u>

Dr. Brian Haftel treated Ms. Horton from June 2011 to October 2013. (R. at 291, 334-75, 481-92). During her 2011 visits with Dr. Haftel, Ms. Horton reported severe burning in her forearms and numbness and tingling in the fingertips of both her hands. (R. at 358). She reported that she was working on restricted duty and avoiding strenuous activity or heavy lifting. (R. at 362). An MRI of the cervical spine performed in December 2011 revealed a bulging disc at the C4-C5 level, a right parasagittal herniation at the C5-C6 level, and a bulging disc at the C6-C7 level, each without stenosis. (R. at 291). In March 2012, a physical examination showed reduced flexion, extension, and rotation of the cervical spine, with C7 midline tenderness but no occipital tenderness. (R. at 338-39). Dr. Haftel advised Ms. Horton to avoid strenuous activity and heavy lifting. (R. at 339). The same findings were reported in May and July. (R. at 334-37).

Dr. Haftel saw Ms. Horton again in June 2013, five months after her second carpal tunnel release surgery. (R. at 483). The plaintiff was taking muscle relaxants and pain killers and had stopped working. (R. at 483). Dr. Hartel's findings were the same as reported in 2012, and remained the same in September and October 2013. (R. at 483-84, 487-88, 491-92).

### d. Lawrence Hospital Center

On March 26, 2012, Ms. Horton was brought to the emergency room at the Lawrence Hospital Center after she reported loss of consciousness while driving as the result of a possible seizure. (R. at 243-48). A CT scan of her head and an electrocardiogram were both normal, and she was assessed as "asymptomatic." (R. at 247). She was advised to avoid driving until seen by a neurologist. (R. at 247).

### e. Dr. Jose Corvalan

On August 27, 2012 Dr. Jose Corvalan conducted a consultative orthopedic examination. (R. at 388-91). He noted in his report that Ms. Horton's son helps her with cooking, cleaning, laundry, shopping, and dressing, and that she showers by herself. (R. at 389). Dr. Corvalan reported that Ms. Horton walked with a normal gait, could walk on her heels and toes without difficulty, and could fully squat. (R. at 389). She did not use an assistive device, needed no help changing for the exam or getting on and off the exam table, and she was able to

8

rise from the chair without difficulty. (R. at 389). The plaintiff's hand and finger dexterity was intact, she exhibited full grip strength, and there was no evidence of any hand use limitation. (R. at 389). Ms. Horton exhibited full flexion, extension, and rotary movement of her cervical spine. (R. at 389). She exhibited tenderness on the lateral aspect of her left elbow but had full range of motion of the shoulders, elbows, forearms, wrists, and fingers without any joint inflammation, effusion, or instability. (R. at 390). Ms. Horton demonstrated normal strength in her proximal and distal muscles, and no muscle atrophy or sensory abnormality. (R. at 390).

Dr. Corvalan diagnosed Ms. Horton with bilateral carpal tunnel syndrome, and noted that her right hand had been operated on in July 2012. (R. at 390). He also assessed a history of epicondylitis (tennis elbow) on her left side, depression, insomnia, high blood pressure, and seizures. (R. at 390). He further noted that there was no evidence of any significant physical limitations. (R. at 390).

### f.  Dr. Albert Villafuerte

Dr. Albert Villafuerte, a rehabilitation specialist, treated Ms. Horton for neck pain on May 3, 2013. (R. at 438). He reported decreased range of motion in the cervical spine. (R. at 438). Dr. Villafuerte noted tenderness on palpation and tightness on cervical lateral flexion, as well as a neck sprain.

(R. at 438, 440). He administered electrical stimulation to the neck and recommended therapeutic exercises to help Ms. Horton regain strength, endurance, range of motion, and flexion. (R. at 442).

On May 29, 2013, Dr. Villafuerte reported that Ms. Horton had tenderness in her bilateral cervical paraspinal muscles with some spasm, and reduced cervical flexion, extension, and rotation. (R. at 436-37). He assessed diminished bilateral grip strength, diminished light touch sensation on both palms, and intact pulses. (R. at 437). He advised Ms. Horton to refrain from strenuous and repetitive activities that might aggravate her symptoms. (R. at 437).

g. Dr. Gregory Chiaramonte

On April 10, 2013, Dr. Gregory Chiaramonte conducted an independent orthopedic examination and diagnosed mild left elbow epicondylitis, and "status post bilateral hands carpal tunnel release." (R. at 499). Dr. Chiaramonte assessed a "mild partial permanent disability." (R. at 499).

h. Dr. Howard Katz

On November 22, 2013, Dr. Howard Katz conducted an independent orthopedic evaluation. (R. at 494-98). He observed a normal range of motion in Ms. Horton's hands, wrists, and fingers, and a normal grip. (R. at 497). Dr. Katz assessed a ten percent loss of use in each hand. (R. at 498).

10

2.  <u>Psychological Evaluations</u>

    a.  <u>Dr. Arlene Broska</u>

On August 27, 2012, Ms. Horton underwent a consultative psychological examination performed by Dr. Arlene Broska, a psychologist. (R. at 383-86). Ms. Horton reported that she woke up three times per night, had a poor appetite, and felt "down" every day, though she denied suicidal or homicidal ideation. (R. at 383). She stated that her medications helped some, though Ambien had stopped working. (R. at 383). Dr. Broska noted that Ms. Horton was cooperative, and that her manner of relating, her social skills, and her overall presentation were adequate. (R. at 384). She was casually dressed and well-groomed, her posture and motor behavior were normal, and her eye contact was appropriate. (R. at 384). She spoke clearly and fluently with adequate language abilities, and her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. (R. at 384). Her affect was appropriate, her mood was neutral, her sensorium was clear, and she was fully oriented. (R. at 384). Her attention and concentration were intact and her recent and remote memory skills were within normal limits. (R. at 384). Dr. Broska determined that the plaintiff's cognitive functioning was average, and her insight and judgment were good. (R. at 384). Dr. Broska also noted that Ms. Horton was able to dress, bathe, and groom herself, use the

microwave, and take public transportation independently. (R. at 384). The plaintiff reported that she received assistance with laundry and shopping. (R. at 384).

Dr. Broska diagnosed Ms. Horton with depressive disorder, not otherwise specified. (R. at 385). With regard to vocational ability, Dr. Broska stated that Ms. Horton could follow and understand simple directions and instructions, perform simple and some complex tasks independently, and maintain attention and concentration. (R. at 385). Dr. Broska reported that the plaintiff could make appropriate decisions and relate adequately with others, but might not always deal appropriately with stress. (R. at 385). Dr. Broska concluded that "results of the examination appear to be consistent with psychiatric problems, but in itself do not appear to be significant enough to interfere with [Ms. Horton's] ability to function on a daily basis." (R. at 385).

### b. Dr. A. Hochberg

On September 20, 2012, Dr. A. Hochberg, a non-examining psychologist, considered the evidence on record. He concluded that Ms. Horton did not have a severe mental impairment. (R. at 393-94).

### C. Procedural History

On July 5, 2012, Ms. Horton filed an application for Disability Insurance Benefits. (R. at 178-79). The application

was denied, and Ms. Horton requested a hearing, which was held on December 19, 2013. (R. at 35-60). Administrative Law Judge ("ALJ") Michael A. Rodriguez issued a decision on April 2, 2014, denying the claim. (R. at 16-28). The Appeals Council denied Ms. Horton's request for review on July 10, 2015, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3).

Analytical Framework

    A.   Determination of Disability

    A claimant is disabled under the Social Security Act and therefore entitled to benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

    To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential

analysis.  20 C.F.R. § 404.1520(a)(4).  First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Second, the claimant must prove that she has a severe impairment that "significantly limits his physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  Third, if the impairment is included in "the Listings" -- 20 C.F.R. Part 404, Subpt. P, App. 1 -- or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.  20 C.F.R. § 404.1520(a)(4)(iii), (d).  Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that he does not have the residual functional capacity ("RFC") to perform his past work.  20 C.F.R. § 404.1520(a)(4)(iv), (e).  Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. §§ 404.1520(a)(4)(v), (g), 404.1560(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or

medical opinions based on these facts, subjective evidence of
pain or disability, and the claimant's educational background,
age, and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d
Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d
Cir. 1983)).

     B.  Judicial Review

     Under Rule 12(c) of the Federal Rules of Civil Procedure, a
party is entitled to judgment on the pleadings if he establishes
that no material facts are in dispute and that she is entitled
to judgment as a matter of law.  See Burnette v. Carothers, 192
F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ.
743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

     The Act provides that the Commissioner's findings "as to
any fact, if supported by substantial evidence, shall be
conclusive."   42 U.S.C. § 405(g).   A court reviewing the
Commissioner's decision "may set aside a decision of the
Commissioner if it is based on legal error or if it is not
supported by substantial evidence." Geertgens v. Colvin, No. 13
Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014)
(quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at
*6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140,
at *21.

     Judicial review, therefore, involves two levels of inquiry.
First, the court must decide whether the Commissioner applied

the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Discussion

    A.  The ALJ's Decision

The ALJ applied the five-step sequential analysis to determine that the plaintiff was not disabled under the Act during the relevant period. (R. at 18-28).

At the initial step, the ALJ found that Ms. Horton had not engaged in substantial gainful activity since January 24, 2012,

the alleged onset date. (R. at 21). At step two, he determined that Ms. Horton suffered from the severe impairments of carpal tunnel syndrome, epicondylitis, and degenerative joint disease of the cervical spine. (R. at 21). However, at step three, the ALJ determined that none of Ms. Horton's impairments, either alone or in combination, met or medically equaled one of the impairments included in the Listings. (R. at 23-24). At step four, the ALJ found that Ms. Horton has the residual functional capacity to perform the full range of light work. (R. at 24).

In making this determination, the ALJ found that Ms. Horton's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 26). The ALJ considered Ms. Horton's acknowledgement that she was able to perform fine motor activities to be inconsistent with significant functional limitation of the upper extremities. (R. at 26). Additionally, the ALJ found that Ms. Horton's course of treatment following her July 2012 carpal tunnel release was generally routine. (R. at 26-27).

Additionally, the ALJ assigned substantial weight to the opinions of Dr. Memoli and Dr. Haftel, two treating physicians. (R. at 27). He discounted the immediate post-surgical opinion of Dr. Faierman, noting that it was reached in the context of

the initial recovery period, and that full range of motion of the hands and wrists returned five months later. (R. at 27). Little weight was given to the finding of Dr. Villafuerte that the plaintiff was 100% disabled, as there was no history of treatment involving Ms. Horton's neck that would support such an extreme finding. (R. at 27). Some weight was accorded to the findings of Dr. Katz, who evaluated Ms. Horton in relation to Workers' Compensation rules, and described a generally normal examination but did report some loss of function. (R. at 27).

The ALJ found that Ms. Horton was unable to perform past relevant work as a corrections officer. (R. at 27). However, taking into consideration Ms. Horton's age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpt. P, App. 2, the ALJ determined at step five that Ms. Horton was not disabled under the Act. (R. at 28).

B.   Substantial Evidence

a.   Physical Impairment

Ms. Horton claims that remand is warranted because the ALJ failed to assess adequately the severity of her physical impairments in determining that they did not meet or equal a listed impairment. Specifically, she argues that the ALJ mischaracterized her functional limitations, her subjective reports regarding the severity of her symptoms, and her

improvement after treatment. As noted above, the ALJ found that Ms. Horton had three severe impairments -- carpal tunnel syndrome, epicondylitis, and degenerative joint disease of the cervical spine -- which imposed more than a minimal functional limitation. (R. at 21-24). However, in considering whether these impairments met the requirements of Listing 11.14 (peripheral neuropathies), the ALJ determined they did not. (R. at 23-24). This decision was supported by substantial evidence.

An impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work. Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) ("Because [the excluded conditions] were considered during the subsequent steps, any error was harmless."); cf. Zabala v. Astrue, 595 F.3d 402, 409-10 (2d Cir. 2010) (where medical report presented no reasonable likelihood of changing ALJ's disability determination, exclusion of report does not require remand).

The plaintiff argues that she meets the requirements of Section 11.14 of the Listings, which requires "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.14. Section 11.04.B requires "[s]ignificant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.04B. However, Ms. Horton did not demonstrate sustained disturbance of gross and dexterous movements, and she improved following prescribed treatment. (R. at 473). After carpal tunnel surgery on each hand, Dr. Faierman reported that Ms. Horton had full motor strength in all upper extremity muscle groups, normal sensation to light touch in all upper extremity distributions, and normal deep tendon reflexes. (R. at 473). While she had limited active range of motion in the cervical spine, she had normal range of motion of all wrist and hand joints and could perform fine manipulations. (R. at 510, 513).

An applicant's carpal tunnel syndrome would "have to qualify as a 'Major dysfunction of a joint' to qualify as a[] [listed] impairment." Gibbs v. Astrue, No. 07 Civ. 10563, 2008 WL 2627714, at *21 (S.D.N.Y. July 2, 2008). Major dysfunction of a joint is characterized by gross anatomical deformity (such

20

as subluxation,[5] contracture, bony or fibrous ankylosis,[6] instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint. 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.02. If the joint at issue is the wrist, there must also be "an inability to perform fine and gross movements effectively." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.02(B). There is no medical evidence that Ms. Horton has either a "gross anatomical deformity" or inability to perform fine and gross movements.

The plaintiff correctly points out that the ALJ mischaracterized Ms. Horton's statement that she is able to pay bills, count change, and handle a savings account as evidence of her ability to perform fine motor skills. (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Memo.") at 12). These activities do not require significant fine motor ability, and these statements were related to Ms. Horton's mental competence, rather than physical ability, to perform such tasks. (Pl. Memo. at 12). In addition,

---

[5]    Subluxation is partial dislocation. Subluxation, MedlinePlus, http://c.merriam-webster.com/medlineplus/ subluxation (last visited Aug. 16, 2016).

[6] Ankylosis refers to stiffness or fixation of a joint by disease or surgery. Ankylosis, MedlinePlus, http://c.merriam-webster.com/medlineplus/ankylosis (last visited Aug. 16, 2016).

the ALJ incorrectly stated that Ms. Horton could cook, clean, do laundry, and shop on her own. (R. at 206-09, 389).

However, Dr. Corvalan's report that Ms. Horton's hand and finger dexterity were intact and that Ms. Horton maintained full grip strength weighs in favor of finding that she had fine motor skills. (R. at 389). Further, the MRI of Ms. Horton's cervical spine in January 2012 showed a herniation at C5-6, but no spinal stenosis. (R. at 291). Therefore, as the ALJ concluded, there was no evidence of nerve root compression or arachnoiditis[7] (R. at 23-24), and the requirements of section 1.04 of the Listings were not met. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

In addition, the plaintiff's allegation that the ALJ failed to consider Section 1.02(a) of the Listings is without merit. (Pl. Memo. at 11). Section 1.02(a) concerns "major peripheral joint[s] (i.e., hip, knee, or ankle)." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.02A, and the plaintiff demonstrated no

---

[7] Arachnoiditis is inflammation of the arachnoid membrane, a membrane that surrounds the nerves of the spinal cord. NINDS Arachnoiditis Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/ disorders/arachnoiditis/arachnoiditis.htm (last updated July 8, 2015).

dysfunction of the hip, knee, or ankle. In sum, the record contains substantial evidence that Ms. Horton's impairments do not equal any listed impairment in severity.

    b. Mental Impairment

There is likewise substantial evidence in the record to support the finding that Ms. Horton did not have a severe mental impairment. Dr. Broska, a psychologist, examined Ms. Horton and found that her psychiatric problems were not "significant enough to interfere with the [her] ability to function on a daily basis." (R. at 385). Dr. Broska reported that the plaintiff had an adequate presence and manner of relating, and normal behavior, speech, and thought processes. (R. at 385). She had a neutral mood, and her concentration, orientation, and memory were within normal limits. (R. at 385). Her cognitive functioning was average, and her insight, ability to understand, and ability to perform were all assessed as normal. (R. at 385).

Additionally, Dr. Hochberg, a non-examining physician, reviewed the record and concluded that Ms. Horton did not have a severe mental impairment. (R. at 393-94). The plaintiff argues that the ALJ erred by "according significant weight" to the opinion of Dr. Hochberg because "he is not a licensed psychiatrist and merely performed a record review without ever examining Ms. Horton." (Pl. Memo. at 8). However, Dr. Hochberg is a licensed psychologist (R. at 66, 70), and an acceptable

medical source under the Commissioner's regulations. See 20 C.F.R § 404.1513(a)(2) (characterizing "[l]icensed or certified psychologists" as acceptable medical sources). Further, his assessment that any mental impairment was not severe is consistent with the assessment of Dr. Broska. See Blaylock-Taylor v. Barnhart, No. 03 Civ. 3437, 2005 WL 1337928, at *10 (S.D.N.Y. June 6, 2005) (opinions of consultative sources constitute substantial evidence when consistent with other medical evidence in record).

The plaintiff argues that the ALJ erred by not giving adequate deference to Dr. Broska's opinion that Ms. Horton may not always deal with stress appropriately, and that the results on her examination were consistent with psychiatric problems. (Pl. Memo. at 8-9). However, psychiatric problems are not severe enough to qualify as a disability if they "would have no more than a minimal effect on an individual's ability to work." Balodis v. Leavitt, 704 F. Supp. 2d 255, 262-63 (E.D.N.Y. 2010). That is precisely Dr. Broska's conclusion: she found that the results of the examination did "not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (R. at 385). The plaintiff alleges that the ALJ erred in crediting this part of the opinion because Dr. Broska was not her "primary treating physician," see Burgess v. Astrue, 537 F.3d 117, 128-29 (2d Cir. 2008) (describing treating

24

physician rule). However, the plaintiff fails to cite any opinion from the claimant's treating physicians related to her mental impairment that the ALJ ignored, and, indeed, there are no medical records reflecting treatment for that impairment.

The plaintiff also argues that the ALJ erred by not giving proper weight to her testimony regarding her subjective complaints of psychological disability. (Pl. Memo. at 9). However, the ALJ noted that Ms. Horton failed to present evidence that she had been treated for psychological ailments. (R. at 22). While she did assert that she had been taking anti-depressants for a number of years, the ALJ noted that during that time she had been able to work. (R. at 22). In conjunction with the reports of Dr. Broska and Dr. Hochberg, this constitutes substantial evidence that Ms. Horton's depression was not a severe impairment.

2. <u>Treating Physician Rule</u>

A treating physician's evaluation is to be given more weight than other medical reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider other factors in determining the weight to

25

be given to that opinion. 20 C.F.R. § 404.1527(c)(2).
Specifically, the ALJ must consider (1) the length of the
treatment relationship and the frequency of examination; (2) the
nature and extent of the relationship; (3) the evidence provided
to support the treating physician's opinion; (4) the consistency
of the opinion with the record as a whole; (5) whether the
opinion is from a specialist; and (6) other factors brought to
the Commissioner's attention that tend to support or contradict
the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); see Halloran, 362
F.3d at 32; Burgess, 537 F.3d at 128.

    Ms. Horton contends that

> instead of properly considering the overwhelming
> medical evidence in the form of opinions from the
> claimant's treating physicians and objective
> diagnostic reports, the ALJ chose to afford such
> reports only limited weight, and instead focused on
> the reports of Dr. Broska, a psychiatric consultative
> examiner who examined Ms. Horton on only a single
> occasion, of A. Hochberg, who is not a licensed
> psychiatrist, and of Dr. Katz, a Workers' Compensation
> insurance carrier's consultant "independent" medical
> examiner.

(Pl. Memo. at 8). However, she does not identify which treating
physician's opinions were improperly weighed. As to her alleged
psychological impairments, the medical records indicate that Ms.
Horton did not have a treating pyschiatrist or psychologist; the
only psychological evaluations she received were from
consultative examiner, Dr. Broska, and the reviewer, Dr.
Hochberg. The ALJ did not credit the post-surgical opinion from

Dr. Faierman, but explained that the "opinion was reached in the context of the immediate post-surgical recovery period, and does not represent the post-recovery limitations." (R. at 27). The ALJ further gave "little weight" to Dr. Vilafuente's report that Ms. Horton was totally disabled due to neck pain. (R. at 27). Although Dr. Vilafuente is a specialist who had a treating relationship with the plaintiff, the medical records reveal that the relationship lasted approximately one month (R. at 436, 438) and, as the ALJ noted, his "extreme finding" is not supported by the plaintiff's history of treatment (R. at 27). Indeed, on what appears to be Ms. Horton's last visit, Dr. Vilafuente merely recommended that she refrain from strenuous and repetitive activities. (R. at 437). Most importantly, however, a physician's assessment that a claimant is disabled is not a medical opinion entitled to deference, as the ultimate issue of disability is reserved for the Commissioner. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

The plaintiff's real complaint seems to be that the ALJ accorded too much weight to the opinions of non-treating physicians. Dr. Katz, a Worker's Compensation consultant who conducted an independent orthopedic evaluation, concluded that Ms. Horton had only a ten percent loss of use in each hand. (R. at 498). However, while Worker's Compensation findings are not binding in the context of the Social Security program, as

standards are different, the findings of other agencies are "entitled to some weight and should be considered." Hankerson v. Harris, 636 F.2d 893, 896-97 (2d Cir. 1980). Thus, it was appropriate for the ALJ to afford some weight to Dr. Katz's findings. The plaintiff alleges that Dr. Hochberg, a psychiatric consultant, is "not a licensed psychiatrist and merely performed a record review without ever examining Ms. Horton." (Pl. Memo. at 8); see Hidalgo v. Colvin, No. 12 Civ. 9009, 2014 WL 2884018, at *21 (S.D.N.Y. June 25, 2014) ("The Regulations are clear that consulting physicians' opinions are entitled only to limited weight because of their typically superficial exposure to the plaintiff."). However, as noted above, Dr. Hochberg's findings are consistent with those of Dr. Broska and there are no contrary medical opinions from treating psychiatrists or psychologists in the record.

### 3. Credibility Assessment

In determining whether a claimant is disabled, the ALJ must consider subjective evidence of pain or disability as testified to by the claimant. 20 C.F.R. § 404.1529(a). However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." Davis v. Massanari, No. 00 Civ. 4330, 2001 WL

1524495, at *6 (S.D.N.Y. Nov. 29, 2001).  If an ALJ finds that a claimant is not credible, he must set forth the reasons for that finding "with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1998). A reviewing court must defer to an ALJ's finding regarding a claimant's credibility when it is supported by substantial evidence. Osorio v. Barnhart, No. 04 Civ. 7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (citing Aponte v. Secretary of Health and Human Services, 728 F.2d 588, 591 (2d Cir. 1984)).

If the claimant's reported symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, consideration is also given to such factors as" (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and adverse side-effects of medication that the claimant has taken to alleviate her symptoms, (5) treatment other than medication that the claimant receives or has received for relief of pain or other symptoms, and (6) any other measures that the claimant uses or has used to relieve her pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

It was well within the discretion of the Commissioner to evaluate the credibility of plaintiff's testimony and render an

29

independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged. Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Snell, 177 F.3d at 135. Indeed, the ALJ's determination should be afforded deference because he heard plaintiff's testimony and observed her demeanor. Tejada, 167 F.3d at 775-76.

While Ms. Horton claims that the ALJ simply glossed over testimony regarding her complaints of pain and the side effects of her medication (Pl. Memo. at 12), the ALJ relied on the plaintiff's own testimony and her medical records to conclude that the medical evidence did not corroborate her allegations of total disability. (R. at 24-26). Additionally, the ALJ relied on the plaintiff's testimony that she did "light things" around the house on a daily basis (R. at 46), shopped (R. at 57, 208-09), was able to bathe, dress, groom herself, and walk independently (R. at 206-08). See 20 C.F.R. 404.1529(c)(3)(i) (including daily activities among relevant credibility factors). The ALJ also considered the medication Ms. Horton took, including Ibuprofen, an over-the-counter medication, and Robaxin, a muscle relaxant (R. at 24, 54, 537); see 20 C.F.R. § 404.1529(c)(3)(v), as well as her use of nighttime braces on her wrists (R. at 24, 57); see 20 C.F.R. § 404.1529(c)(3)(vi).

To be sure, Ms. Horton has an extensive work history. "A claimant with a good work record is entitled to substantial

credibility when claiming an inability to work because of disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983). "Work history, however, is but one of many factors to be utilized by the ALJ in determining credibility." Marine v. Barnhart, No. 00 Civ. 9392, 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003). That Ms. Horton's "work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination." Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011). In sum, the ALJ's conclusion that Ms. Horton's account of the severity of her symptoms is less than credible is supported by substantial evidence, and thus is entitled to deference.

4. Residual Functional Capacity

The ALJ determined that Ms. Fulton had the residual functional capacity to perform "the full range of light work." (R. at 24-27). When determining a claimant's residual functional capacity, the ALJ must consider all relevant evidence regarding the claimant's physical and mental abilities, pain, and other limitations in order to determine whether she retains the ability to return to past relevant work or, in the alternative, to adjust to other work existing in the national economy. 20 C.F.R. 404.1545(a).

Substantial evidence supports the ALJ's determination that Ms. Horton could perform light work. Light work requires frequent lifting of up to ten pounds and no lifting of more than twenty pounds; standing or walking off-and-on for up to six hours of an eight hour day, with "the ability to stand being more critical than the ability to walk"; and the "use of arms and hands to grasp and to hold and turn objects," but generally not the use of fingers for fine work. Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6 (Jan. 1, 1983); 20 C.F.R. § 404.1567(b).

In making this determination, the ALJ properly accorded significant weight to the assessments of Dr. Memoli, the treating orthopedic surgeon, and Dr. Haftel, the treating pain management physician, as well as some weight to the findings of Dr. Katz, the examining orthopedic surgeon. (R. at 27). Dr. Memoli assessed a mild to moderate partial disability for worker's compensation purposes and reported that Ms. Horton could continue light work. (R. at 256). Dr. Haftel reported that Ms. Horton should only avoid strenuous activity and heavy lifting. (R. at 367, 371, 375).

The ALJ properly accorded only some weight to Dr. Katz, who conducted a one-time independent evaluation. (R. at 494-98). Dr. Katz assessed only a ten percent loss of use of each hand for worker's compensation purposes. (R. at 498). As stated

previously, Dr. Katz's findings for worker's compensation purposes are "entitled to some weight and should be considered." Hankerson, 636 F.2d at 896-97.

Additionally, the ALJ properly afforded some weight to the assessments of Dr. Villafuerte, the physiatrist, and Dr. Chiaramonte and Dr. Corvalan, who acted as consultative examiners. Dr. Villafuerte recommended that Ms. Horton only refrain from strenuous and repetitive activities that might aggravate her symptoms, an assessment consistent with light work. (R. at 437). Dr. Chiaramonte assessed only a "mild partial permanent disability." (R. at 499). Dr. Corvalan assessed no significant physical limitations during his examination. (R. at 390). While the ALJ discounted Dr. Corvalan's assessment given the other evidence pointing to a history of bilateral carpal tunnel syndrome, his opinion was still consistent with the ALJ's finding of non-disability. Finally, the ALJ properly afforded no weight to the immediate post-surgical opinion of Dr. Faierman. See Halloran, 362 F.3d at 32 (noting that treating physician not entitled to deference where opinions are inconsistent with "other substantial evidence in the record, such as the opinions of other medical experts"); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

Nevertheless, Ms. Horton argues that the totality of the medical evidence supports a finding that she cannot work on a

regular and continuing basis. (Pl. Memo. at 14). She alleges that the ALJ failed to afford adequate weight to the "severe limitations" noted in medical records from her treating doctors, as well as the side effects of her medications, which caused drowsiness that directly impacted her ability to work. (Pl. Memo. at 14). However, it is apparent that the ALJ considered all the relevant medical records and non-medical evidence and found that Ms. Horton's "generally routine post-surgical recovery," together with her testimony, supported the finding that she retained the capability to perform light work. (R. at 27); Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013) (explaining that residual functional capacity determination evaluates "all of the [applicant's] symptoms and the extent to which the claimed symptoms can reasonably be accepted as consistent" with the record."); Mojica v. Commissioner of Social Security, No. 13 Civ. 5631, 2014 WL 6480684, at *13 (S.D.N.Y. Nov. 17, 2014) (finding that in determining capacity, ALJ properly evaluated credibility of plaintiff's alleged symptoms in context of entire record). In sum, there was substantial evidence for the ALJ's determination regarding Ms. Horton's residual functional capacity.[8]

---

[8] Having concluded that the ALJ's residual functional capacity determination is free of legal taint, I need not reach the plaintiff's argument that, as an individual "limited to less

Conclusion

For the foregoing reasons, the plaintiff's motion for judgment on the pleadings (Docket no. 13) is denied and the Commissioner's cross-motion (Docket no. 15) is granted. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       August 17, 2016

Copies mailed this date to:

Joseph A. Romano, Esq.
Law Offices of Joseph A. Romano
1776 Eastchester Road, Suite 220
Bronx, New York 10461

Susan D. Baird, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

than the full range of sedentary work," the Medical Vocational Guidelines direct a finding of disability. (Pl. Memo. at 14).